Robert V. Prongay (SBN 270796)
 rprongay@glancylaw.com
Casey E. Sadler (SBN 274241)
 csadler@glancylaw.com
Pavithra Rajesh (SBN 323055)
 prajesh@glancylaw.com
GLANCY PRONGAY & MURRAY LLP
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

*Counsel for Lead Plaintiff Norman Kremer and
Lead Counsel for the Class*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VIRON BRYAN NGOSIOK, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>PULSE BIOSCIENCES, INC., DARRIN UECKER, and SANDRA A. GARDINER,<br><br>Defendant. | Case No. 3:22-cv-00959-CRB<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**<br><br><u>DEMAND FOR JURY TRIAL</u> |

**<u>TABLE OF CONTENTS</u>**

I.      NATURE OF THE ACTION AND OVERVIEW ................................................................1

II.      JURISDICTION AND VENUE .....................................................................................2

III.      PARTIES ..........................................................................................................3

IV.      SUBSTANTIVE ALLEGATIONS .................................................................................4

         A.      Company Overview ...............................................................................4

         B.      The CellFX System ...............................................................................4

         C.      Pulse Previously Tried And Failed To Obtain Approval Of The CellFX System For Sebaceous Hyperplasia ...............................................................................5

                 1.      Pulse's 510(k) Application For CellFX System To Remove General Benign Lesions, Including Sebaceous Hyperplasia, Is Rejected ...............................5

                 2.      Pulse Obtains Regulatory Approval Of The 510(k) Application For A General Dermatologic Indication ...............................................................................6

         D.      Pulse Completes A Comparative Study To Support A Renewed Application For Sebaceous Hyperplasia ...............................................................................6

         E.      Throughout The Class Period, Defendants Fail To Disclose That The Comparative Study Did Not Meet Its Primary Endpoint ...............................................................................8

         F.      The FDA Reveals That The Comparative Study Failed To Meet Its Primary Endpoints ...............................................................................9

V.      MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD ...............................................................................10

VI.      LOSS CAUSATION ...............................................................................17

VII.      POST-CLASS PERIOD EVENTS ...............................................................................17

VIII.      ADDITIONAL SCIENTER ALLEGATIONS ...............................................................................18

IX.      CORPORATE SCIENTER ALLEGATIONS ...............................................................................19

X.      CLASS ACTION ALLEGATIONS ...............................................................................20

XI.      UNDISCLOSED ADVERSE FACTS ...............................................................................21

XII.      APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE) ...............................................................................22

XIII.      NO SAFE HARBOR ...............................................................................24

XIV.      CLAIMS ...............................................................................25

XV.      PRAYER FOR RELIEF ...............................................................................28

XVI.      JURY TRIAL DEMANDED ...............................................................................29

Lead Plaintiff Norman Kremer and additional plaintiff Viron Bryan Ngosiok (together, "Plaintiffs"), individually and on behalf of all others similarly situated, by and through their attorneys, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, among other things, their counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Pulse Biosciences, Inc. ("Pulse" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Pulse; and (c) review of other publicly available information concerning Pulse.

I.      NATURE OF THE ACTION AND OVERVIEW

1.      Pulse is a bioelectric medicine company. Its only product is the CellFX System which uses the Company's proprietary Nano-Pulse Stimulation technology ("NPS") to treat a variety of lesions, including sebaceous hyperplasia ("SH"), seborrheic keratosis ("SK"), and nongenital warts. According to the Company, the total addressable market for these three types of lesions for the CellFX System is $3 billion globally.

2.      Back in 2019, the Company had tried and failed to obtain approval from the U.S. Food and Drug Administration ("FDA") for the CellFX System as a treatment for sebaceous hyperplasia, which are skin lesions caused by the hyper proliferation of sebaceous glands. When the FDA rejected the application in February 2020, Defendants stated that they "now understand that the data was not sufficient . . . and that comparative clinical data would be necessary to make a direct comparison" to show that the CellFX System was substantially equivalent to a predicate device.

3.      Following this setback, the Company decided to proceed with a stepwise approach to obtaining indications in SH and SK, where it would start with a more general dermatologic indication before adding specific indications for the device. As such, in October 2020, Pulse initiated its investigational device exemption ("IDE") study to evaluate the treatment of sebaceous hyperplasia lesions using the CellFX System compared with the predicate treatment,

electrodessication. And the Company submitted its initial application for a general dermatologic indication in November 2020 for which the Company received approval on February 3, 2021.

4. By January 2021, the IDE study had "completed all treatments." In February 2021, the Company stated that it was finalizing the 510(k) application and by the end of April, the study had reached its "Actual Primary Completion Date," which is the "date on which the last participant in a clinical study was examined or received an intervention to collect final data for the primary outcome measure."

5. By the time of the start of the Class Period, it was clear that the IDE study had failed to meet its primary endpoints. Yet, throughout the Class Period, including even after the Pulse submitted the 510(k) application based on the IDE study results, the Company failed to disclose to investors the IDE study evaluating the use of the CellFX System to treat sebaceous hyperplasia lesions failed to meet its primary endpoints and that, as a result, there was a substantial risk to approval for the CellFX System to treat sebaceous hyperplasia lesions.

6. As such, it was a shock to the market when the truth was revealed on February 8, 2022. On that date, the FDA issued an "additional information" letter, concluding there was insufficient clinical evidence to support the Company's submission for the SH indication. Among other things, the FDA found "that the Company had not met the primary endpoints of the sebaceous hyperplasia FDA-approved IDE study." On this news, the Company's share price fell $3.74, or over 34%, to close at $7.12 per share on February 8, 2022, on unusually heavy trading volume.

7. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## II.     JURISDICTION AND VENUE

8. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

9. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

10.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, the Company's principal executive offices are located in this District.

11.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

**III.    PARTIES**

12.     Lead Plaintiff Norman Kremer, as set forth in his previously filed certification (Dkt. No. 20-2), incorporated by reference herein, purchased Pulse securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

13.     Additional plaintiff Viron Bryan Ngosiok, as set forth in his previously filed certification (Dkt. No. 1 at 19-20), incorporated by reference herein, purchased Pulse securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

14.     Defendant Pulse is incorporated under the laws of Delaware with its principal executive offices located in Hayward, California. Pulse's common stock trades on the NASDAQ exchange under the symbol "PLSE."

15.     Defendant Darrin Uecker ("Uecker") was the Company's Chief Executive Officer ("CEO") at all relevant times.

16.     Defendant Sandra A. Gardiner ("Gardiner") was the Company's Chief Financial Officer ("CFO") at all relevant times.

17.     Defendants Uecker and Gardiner (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of

the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    Company Overview

18.    Pulse is a bioelectric medicine company. Its only product is the CellFX System which uses the Company's proprietary Nano-Pulse Stimulation technology ("NPS") to treat a variety of lesions, including sebaceous hyperplasia ("SH"), seborrheic keratosis ("SK"), and nongenital warts.

19.    Pulse touts a $3 billion total addressable market globally for the CellFX System for these three types of lesions. Unlike other medical device companies which traditionally operate a razor-razorblade model, Pulse sells the CellFX System and also recognizes revenue whenever a physician treats a lesion. Any disposable components (like a razorblade in the traditional model) is provided to physicians free of charge. However, the Company did not generate revenue until third quarter 2021, when it began to commercialize the CellFX System for certain indications.

### B.    The CellFX System

20.    As relevant here, the CellFX System can purportedly be used to treat SH lesions, which are small lesions on the face caused by hyper proliferation of sebaceous glands. The Company's surveys showed that "largely 60% to 70% of these patients go untreated."

21.    According to the Company, there are no treatments offered by dermatologists because the glands are deep in the dermis (skin) and using traditional methods to clear the lesion could cause a "negative cosmetic outcome," leaving the treated skin worse than the original condition. According to the Company, CellFX System presented an advantage over these traditional

thermal methods because the NPS technology "directly impacts cellular structures while sparing non cellular tissue (primarily collagen)," thus clearing the lesion without resulting in a negative cosmetic outcome.

22.    The CellFX System is a standard console-based system which can be wheeled around a clinic or in and out of offices where patients are being treated. It has a handpiece to which treatment tips are pressed just prior to treatment. Each treatment tip has a unique geometry and is selected based on the lesion size being treated. The user interface also has a number of treatment settings, and the physician's selection deploys a set of micro needles into the tissue to treat the lesion. The process takes between 8 to 12 seconds.

23.    The CellFX System is a medical device, which requires regulatory approval from the U.S. Food and Drug Administration ("FDA") to be commercialized in the U.S. Specifically, Pulse must file a 510(k) premarket submission demonstrating that CellFX System is at least as safe and effective, *i.e.*, substantially equivalent, to a legally marketed device that is not subject to premarket approval. *See generally* 21 C.F.R. § 807.92(a)(3).

**C.    Pulse Previously Tried And Failed To Obtain Approval Of The CellFX System For Sebaceous Hyperplasia**

**1.    Pulse's 510(k) Application For CellFX System To Remove General Benign Lesions, Including Sebaceous Hyperplasia, Is Rejected**

24.    In February 2019, Pulse submitted its 510(k) application to the FDA seeking to commercialize the CellFX System to remove general benign lesions, including SH and SK. It was supported by safety and efficacy data from single-arm clinical studies, as well as pre-clinical and bench data in support of the use of the CellFX System in dermatology. As to SH, one of these studies purportedly showed that 99.5% of facial SH lesions were "clear" or "mostly clear" 60 days after treatment among 73 patients.

25.    However, on February 13, 2020, Pulse received a "Not Substantially Equivalent" letter from the FDA indicating that, based on the data provided, Pulse had "not demonstrated that the CellFX System is substantially equivalent to the predicate device." During a conference call Pulse held in connection with this announcement, Defendant Uecker stated that, while management believed the clinical data supported the 510(k) submission, "we now understand the data was not

sufficient for FDA to conclude with the clearance for these indications and ***that comparative controlled clinical data would be necessary to make a direct comparison.***[1] He emphasized that there was nothing wrong with the identification of the predicate device, but that "the FDA did not see the level of evidence provided as sufficient to establish substantial equivalence without a comparative control."

26.     During Pulse's review with the FDA, the Company discussed "a stepwise approach to obtaining indications in SH and SK, starting with a more general dermatologic indication before adding specific indications." The advantage to this approach "is that it could be more efficient from a timing perspective," according to Defendant Uecker.

## 2.     Pulse Obtains Regulatory Approval Of The 510(k) Application For A General Dermatologic Indication

27.     Ultimately, Defendants decided to proceed with the stepwise approach and sought regulatory approval for a generalized indication while the Company completed additional clinical trials for SH and SK. On November 9, 2020, Defendants announced that Pulse had submitted its initial 510(k) application for a general dermatologic indication for the CellFX System. It was supported by preclinical data evaluating the treatment of animal skin at multiple follow-up time points, which "demonstrated strong performance in skin treatment and healing as we expected, giving [Defendants] confidence in the quality of [Pulse's] 510(k) submission."

28.     On February 3, 2021, Pulse announced that it received clearance from the FDA of the CellFX System for dermatologic procedures requiring ablation and resurfacing of the skin.

## D.     Pulse Completes A Comparative Study To Support A Renewed Application For Sebaceous Hyperplasia

29.     Meanwhile, Pulse proceeded to conduct the comparative study necessary to resubmit its 510(k) application for SH. On October 1, 2020, Pulse issued a press release announcing FDA approval of and the Company's initiation of an investigational device exemption ("IDE") study to evaluate SH lesions using the CellFX System. The data from this study was "intended to support a

---

[1] Unless otherwise stated, all emphasis in bold and italics hereinafter is added.

510(k) submission to expand the indication for use of the CellFX System specifically to treat SH lesions." The Company disclosed the following as to the study design:

> The multicenter prospective comparative study is intended to evaluate the safety and efficacy of procedures to clear facial SH lesions performed with the CellFX System versus those performed by electrodessication in a comparator group. Enrollment of 60 patients across five study sites is expected to be completed in approximately three months. ***All subjects will have up to two treatments and will be evaluated through the primary safety and efficacy endpoints at 60-days following their last treatment.*** The ClinicalTrials.gov Identifier for the study is NCT04539886.

30. In the same press release, Defendant Uecker was quoted as saying that "[b]arring delays in enrollment, we expect to conclude the study in the first quarter of 2021 and plan to quickly follow with a 510(k) submission for the corresponding specific indication." He reiterated that Defendants have "***long viewed SH as a top addressable market priority*** for the CellFX System . . . ."

31. In the study, each subject would receive a treatment from the CellFX System and from the comparator (the electrodesiccation procedure) on each side of the face and would be evaluated by a blinded investigator at regular intervals.[2] Thirty days after the initial treatment, the subject will be evaluated for eligibility to receive an additional treatment. *Id.* Specifically, ClinicalTrials.gov, which identified that the information was provided by Pulse, stated:

> Detailed Description:
>
> This SH comparative study will evaluate safety and efficacy in a split face design using the CellFX System and pre-defined energy profile for all primary and secondary treatments based on Fitzpatrick Skin Types and tip size. The comparator group will be treated with the same standardized intralesional electrodesiccation procedure conducted by all participating clinical sites. Subjects with 4-10 qualifying SH lesions on the face except the scalp, nose and within the orbital region will be enrolled. Each subject will be evaluated by the blinded site investigator at 7-days, 30-days, and 60-days post-initial CellFX and Electrodessication treatments. At the 30-day follow-up visit, lesions will be evaluate using Global Aesthetic Improvement Scale (GAIS), for eligibility to receive an additional treatment. In case of a second treatment, the subject will be evaluated by the blinded site investigator at 30-days and 60-days post-retreatment. ***Photography of the study lesions will be captured along with the blinded site investigator assessments at all visits.***

32. The primary endpoints for this comparative study were the change in lesion appearance and any adverse skin changes, which were both measured 60 days after the last

---

[2] https://clinicaltrials.gov/ct2/show/study/NCT04539886

treatment. *Id.* The change in lesion appearance was measured by the Global Aesthetic Improvement Scale ("GAIS"), which ranges from 1 (meaning "Exceptional Improvement") to 5 (meaning "Worsened Appearance Compared with Original Condition"). *Id.* The adverse skin changes were measured by the "[p]resence or absence of a composite safety event." *Id.*

33.    Just one month after commencing enrollment in the study, Defendants accelerated the expected submission of the 510(k) application for SH as an expanded indication. Specifically, during the Q3 2020 call on November 9, 2020, Defendant Uecker stated: "Given where we are with the study timeline, it is likely we will accelerate the submission of this 510(k) for treatment of SH to the first quarter of 2021 versus the second quarter of 2021, as we had previously communicated."

**E.    Throughout The Class Period, Defendants Fail To Disclose That The Comparative Study Did Not Meet Its Primary Endpoint**

34.    On January 12, 2021, Defendants announced that Pulse had "[c]ompleted ***all treatments***" in the comparative study for SH. As a result, the primary endpoint outcomes for the last participant must be measured no later than March 13, 2021 (*i.e.*, 60 days after the last treatment). However, according to ClinicalTrials.gov, the "Actual Primary Completion Date" for the study was "April 23, 2021."[3]

35.    Throughout the Class Period, Defendants claimed to be "finalizing" the 510(k) application for CellFX System to treat SH, but repeatedly delayed the timeline for the expected submission. For example, on February 22, 2021, Defendant Uecker claimed that Defendants were "finalizing this 510(k) submission, and it is on track to be submitted to the FDA as early as the end of the first quarter." However, six months later, he claimed that Defendants were still completing the necessary analyses for the application, including a "blinded photographic review [that] can only occur after all the patient follow-up is completed, and its subsequent analysis continues." On August 9, 2021, Defendant Uecker stated that that blinded review would be completed during third quarter 2021.

---

[3] ClinicalTrials.gov defines "Primary Completion Date" as "[t]he date on which the last participant in a clinical study was examined or received an intervention to collect final data for the primary outcome measure." All information about the study on the website was provided by Pulse.

36.     Throughout the Class Period, Defendants repeatedly touted the CellFX System's purported efficacy and safety to treat SH, claiming that it showed a "99.5% efficacy rate" in clearing SH lesions.

37.     Defendants submitted the 510(k) in November 2021, five months after they'd originally forecast. However, they still did not disclose the results of the IDE study, leading investors to believe that they were consistent with prior study results on the efficacy and safety of the CellFX System.

F.     **The FDA Reveals That The Comparative Study Failed To Meet Its Primary Endpoints**

38.     On February 8, 2022, before the market opened, Pulse announced that the FDA concluded there was insufficient clinical evidence to support the Company's 510(k) submission to expand the label for the CellFX System to treat sebaceous hyperplasia. Among other things, the FDA found "that the Company had not met the primary endpoints of the sebaceous hyperplasia FDA-approved IDE study." Specifically, the Company's press release stated, in relevant part:

> The Company submitted a 510(k) in December 2021 to add the treatment of sebaceous hyperplasia to the CellFX System's indications for use in the United States. On February 5, 2022, the Company received an Additional Information ("AI") letter from the FDA in response to the 510(k) submitted. In the AI letter, the FDA stated it did not believe the Company provided sufficient clinical evidence at this time to support the expanded indication for use, ***and that the Company had not met the primary endpoints of the sebaceous hyperplasia FDA-approved IDE study***. The Company anticipates meeting with the FDA to discuss the contents of the AI letter and potential next steps, which may require additional clinical data and potentially a new 510(k) submission. The AI letter is a standard part of the 510(k) review process and places the review on hold until the Company responds within 180 days of the request in the AI letter. Based on FDA guidance, the Company believes its meeting with the FDA will take place in Q1 2022.

39.     On this news, the Company's share price fell $3.74, or over 34%, to close at $7.12 per share on February 8, 2022, on unusually heavy trading volume.

40.     A research note by H.C. Wainwright recognized that "the company has not released the clinical data from the IDE study and so we have limited insight into the specific analysis that the agency is alluding to."

## V. MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

41.     The Class Period begins on May 10, 2021. On that day, Pulse held a conference call in connection with its first quarter 2021 financial results. During the call, Defendant Uecker stated: "We have completed all treatments and follow-up of the patients in this [SH] study during the first quarter. And at this point, *we're in the final stages of preparing a 510(k) submission* and expect the submission to go to FDA within the next several weeks." Similarly, in response to a question confirming that the 510(k) application for SH would be submitted by the end of second quarter 2021, Defendant Uecker replied: "[T]hat's right. Sebaceous hyperplasia here in the next several weeks. *We're just finishing up that 510(k).*"

42.     The above statements were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose the adverse facts that the IDE study evaluating the use of the CellFX System to treat sebaceous hyperplasia lesions failed to meet its primary endpoints and that, as a result, there was a substantial risk to approval for the CellFX System to treat sebaceous hyperplasia lesions. Additionally, these materially false and misleading statements were made with scienter. Defendants were deliberately reckless as to the falsity of these statements because Pulse's executives had received, reviewed and analyzed the IDE study results, which were the basis for the 510(k) submission, that demonstrated that the IDE study had failed to meet its primary endpoints.

43.     Also on May 10, 2021, Defendants filed the quarterly report on Form 10-Q for the period ended March 31, 2021. It was signed by Defendant Gardiner. It stated, in relevant part:

> *If we fail to maintain necessary regulatory clearance for our product, or if clearances or approvals for future devices and indications are delayed or not issued, our commercial operations would be harmed. Additionally, changes in methods of product candidate manufacturing may result in additional costs or delay.*
>
> \*          \*          \*
>
> In February 2021, we received a 510(k) clearance from the U.S. FDA for our CellFX System for dermatologic procedures requiring ablation and resurfacing of the skin. Following this general dermatologic indication, we plan to pursue specific indications for the CellFX System, starting with an indication for the treatment of SH lesions. This will require an additional 510(k) submission, as will each subsequent indication, and will likely be based on comparative clinical data.

*However, the failure to obtain further 510(k) clearances may add significant time and expense to our regulatory clearance process, may delay our ability to generate revenue, and may have a negative impact on our stock price. We may not be able to obtain the necessary clearances or approvals necessary to market our CellFX System for specific indications or such approvals or clearances may be unduly delayed, which could harm our business.* If the FDA rejects our 510(k) submissions for specific indications, we may be required to obtain FDA approval through the de novo pathway, which will require additional time and resources, including the need to conduct more clinical studies to demonstrate safety and effectiveness of our candidate device.

The FDA may not approve or clear, or may delay approval or clearance of, our 510(k), de novo, or PMA applications on a timely basis or at all. Such delays or refusals could have a material adverse effect on our business operations and financial condition. The FDA may also change its clearance and approval policies, adopt additional regulations or revise existing regulations, or take other actions which may prevent or delay approval or clearance of our products under development. Any of these actions could have a material adverse effect on our business operations and financial condition.

(First emphasis in original.)

44.     The above statements were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose the adverse facts that the IDE study evaluating the use of the CellFX System to treat sebaceous hyperplasia lesions failed to meet its primary endpoints and that, as a result, there was a substantial risk to approval for the CellFX System to treat sebaceous hyperplasia lesions. Additionally, these materially false and misleading statements were made with scienter. Defendants were deliberately reckless as to the falsity of these statements because Pulse's executives had received, reviewed and analyzed the IDE study results, which were the basis for the 510(k) submission, that demonstrated that the IDE study had failed to meet its primary endpoints.

45.     On June 2, 2021, at the Jefferies 2021 Virtual Healthcare Conference, Defendant Uecker affirmed that for "the first of those [indications], sebaceous hyperplasia, we had an IDE-approved study for that. Last year, we've completed enrollment in that study. We expect to submit that 510(k) this quarter."

46.     The above statements were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose the adverse facts that the IDE study evaluating the use of the CellFX System to treat sebaceous hyperplasia lesions failed to meet its primary endpoints and that, as a result, there was a

substantial risk to approval for the CellFX System to treat sebaceous hyperplasia lesions. Additionally, these materially false and misleading statements were made with scienter. Defendants were deliberately reckless as to the falsity of these statements because Pulse's executives had received, reviewed and analyzed the IDE study results, which were the basis for the 510(k) submission, that demonstrated that the IDE study had failed to meet its primary endpoints.

47. On August 9, 2021, Pulse announced its second quarter 2021 financial results in a press release. During the related conference call, Defendant Uecker stated, in relevant part:

> During the first quarter, we concluded follow-up of 60 patients in an FDA IDE approved comparative study, comparing the use of the CellFX System against electrodessication, treat sebaceous hyperplasia, and began the data analysis process. While we plan to file the 510(k) by this time, we are still completing the necessary steps to do so.
>
> This IDE approved study FDA requested a number of safety and efficacy endpoints, including a blinded independent review by three dermatologists using photographic images of the treated lesions. The process of developing this blinded photographic review can only occur after all the patient follow-up is completed, and its subsequent analysis continues. We anticipate having the analysis completed this quarter and expect to pursue a 510(k) submission at that time.

48. The above statements were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose the adverse facts that the IDE study evaluating the use of the CellFX System to treat sebaceous hyperplasia lesions failed to meet its primary endpoints and that, as a result, there was a substantial risk to approval for the CellFX System to treat sebaceous hyperplasia lesions. Additionally, these materially false and misleading statements were made with scienter. Defendants were deliberately reckless as to the falsity of these statements because Pulse's executives had received, reviewed and analyzed the IDE study results, which were the basis for the 510(k) submission, that demonstrated that the IDE study had failed to meet its primary endpoints.

49. During the same August 9, 2021 call, Defendant Uecker stated that Pulse would not release the SH clinical data ahead of its regulatory submission. Specifically, the following exchange occurred during the call:

> **Analyst**: Congratulation on a great quarter. Just maybe a little bit more on the upcoming 510(k) applications for extension work. So I was wondering, with the data analysis expected to finalize this quarter and next quarter, would you be releasing some of those data ahead of your submissions?

**Defendant Uecker**: Ahead of the submissions, most likely not. I mean I think a lot of the data rollout follows the cadence of some of the meetings, some of the big meetings in this area. But I think as it relates to clinical data that's going to go into a submission to FDA, it's typical to get that to FDA and get that through the process before going out publicly with it.

50.     The above statements were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose the adverse facts that the IDE study evaluating the use of the CellFX System to treat sebaceous hyperplasia lesions failed to meet its primary endpoints and that, as a result, there was a substantial risk to approval for the CellFX System to treat sebaceous hyperplasia lesions. Additionally, these materially false and misleading statements were made with scienter. Defendants were deliberately reckless as to the falsity of these statements because Pulse's executives had received, reviewed and analyzed the IDE study results, which were the basis for the 510(k) submission, that demonstrated that the IDE study had failed to meet its primary endpoints.

51.     Also on August 9, 2021, Defendants filed the quarterly report on Form 10-Q for the period ended June 30, 2021. It was signed by Defendant Gardiner. It stated, in relevant part:

> ***If we fail to maintain necessary regulatory clearance for our product, or if clearances or approvals for future devices and indications are delayed or not issued, our commercial operations would be harmed. Additionally, changes in methods of product candidate manufacturing may result in additional costs or delay.***
>
> \*          \*          \*
>
> In February 2021, we received a 510(k) clearance from the U.S. FDA for our CellFX System for dermatologic procedures requiring ablation and resurfacing of the skin. Following this general dermatologic indication, we plan to pursue specific indications for the CellFX System, starting with an indication for the treatment of SH lesions. This will require an additional 510(k) submission, as will each subsequent indication, and will likely be based on comparative clinical data.
>
> ***However, the failure to obtain further 510(k) clearances may add significant time and expense to our regulatory clearance process, may delay our ability to generate revenue, and may have a negative impact on our stock price. We may not be able to obtain the necessary clearances or approvals necessary to market our CellFX System for specific indications or such approvals or clearances may be unduly delayed, which could harm our business.*** If the FDA rejects our 510(k) submissions for specific indications, we may be required to obtain FDA approval through the de novo pathway, which will require additional time and resources, including the need to conduct more clinical studies to demonstrate safety and effectiveness of our candidate device.

The FDA may not approve or clear, or may delay approval or clearance of, our 510(k), de novo, or PMA applications on a timely basis or at all. Such delays or refusals could have a material adverse effect on our business operations and financial condition. The FDA may also change its clearance and approval policies, adopt additional regulations or revise existing regulations, or take other actions which may prevent or delay approval or clearance of our products under development. Any of these actions could have a material adverse effect on our business operations and financial condition.

(First emphasis in original.)

52.     The above statements were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose the adverse facts that the IDE study evaluating the use of the CellFX System to treat sebaceous hyperplasia lesions failed to meet its primary endpoints and that, as a result, there was a substantial risk to approval for the CellFX System to treat sebaceous hyperplasia lesions. Additionally, these materially false and misleading statements were made with scienter. Defendants were deliberately reckless as to the falsity of these statements because Pulse's executives had received, reviewed and analyzed the IDE study results, which were the basis for the 510(k) submission, that demonstrated that the IDE study had failed to meet its primary endpoints.

53.     On September 13, 2021, the Individual Defendants represented Pulse at the H.C. Wainwright 23rd Annual Global Investment Conference. During the conference, Defendant Uecker stated that Pulse "completed follow-up of patients" and was "in the midst of sort of the analysis of that data." He continued that "that analysis has some complication or – not complications, but it's – has some kind of new forms of clinical assessments and analysis of that data that includes independent review, photographic review." As a result, he "expect[ed] that [Pulse will] get through that this quarter and then be in a position to take [its] next step, which [Defendants] hope will be to submit a 510(k) for clearance for sebaceous hyperplasia."

54.     The above statements were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose the adverse facts that the IDE study evaluating the use of the CellFX System to treat sebaceous hyperplasia lesions failed to meet its primary endpoints and that, as a result, there was a substantial risk to approval for the CellFX System to treat sebaceous hyperplasia lesions.

Additionally, these materially false and misleading statements were made with scienter. Defendants were deliberately reckless as to the falsity of these statements because Pulse's executives had received, reviewed and analyzed the IDE study results, which were the basis for the 510(k) submission, that demonstrated that the IDE study had failed to meet its primary endpoints.

55. On November 15, 2021, Pulse announced its third quarter 2021 financial results in a press release. During the related conference call, Defendant Uecker stated: "We completed the FDA approved IDE study for the treatment of sebaceous hyperplasia earlier in the year and recently finalized all of the necessary analysis. We are pleased to report that 510(k) will be submitted this week to FDA." He also tried to "temper some expectations" that the 510(k) review period would take only 90 days, stating:

> There's usually time that is also taken up by whatever questions they may ask the company. And so the only reason I bring that up is this is the first sort of FDA-approved IDE study 510(k) that we were submitting to the FDA for the CellFX System. And so I think I would temper some expectations, it's probably going to be longer than 90 days. I think many of these can go 120, maybe out to 150 days. So I think we're excited to start getting this data into FDA and get into the review process and be able to engage with them.

56. The above statements were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose the adverse facts that the IDE study evaluating the use of the CellFX System to treat sebaceous hyperplasia lesions failed to meet its primary endpoints and that, as a result, there was a substantial risk to approval for the CellFX System to treat sebaceous hyperplasia lesions. Additionally, these materially false and misleading statements were made with scienter. Defendants were deliberately reckless as to the falsity of these statements because Pulse's executives had received, reviewed and analyzed the IDE study results, which were the basis for the 510(k) submission, that demonstrated that the IDE study had failed to meet its primary endpoints.

57. Also on November 15, 2021, Defendants filed the quarterly report on Form 10-Q for the period ended September 30, 2021. It was signed by Defendant Gardiner. It stated, in relevant part:

> **If we fail to maintain necessary regulatory clearance for our product, or if clearances or approvals for future devices and indications are delayed or not issued, our commercial operations would be harmed. Additionally, changes in**

***methods of product candidate manufacturing may result in additional costs or delay.***

\* \* \*

In February 2021, we received a 510(k) clearance from the U.S. FDA for our CellFX System for dermatologic procedures requiring ablation and resurfacing of the skin. Following this general dermatologic indication, we plan to pursue specific indications for the CellFX System, starting with an indication for the treatment of SH lesions. This will require an additional 510(k) submission, as will each subsequent indication, and will likely be based on comparative clinical data.

***However, the failure to obtain further 510(k) clearances may add significant time and expense to our regulatory clearance process, may delay our ability to generate revenue, and may have a negative impact on our stock price. We may not be able to obtain the necessary clearances or approvals necessary to market our CellFX System for specific indications or such approvals or clearances may be unduly delayed, which could harm our business.*** If the FDA rejects our 510(k) submissions for specific indications, we may be required to obtain FDA approval through the de novo pathway, which will require additional time and resources, including the need to conduct more clinical studies to demonstrate safety and effectiveness of our candidate device.

The FDA may not approve or clear, or may delay approval or clearance of, our 510(k), de novo, or PMA applications on a timely basis or at all. Such delays or refusals could have a material adverse effect on our business operations and financial condition. The FDA may also change its clearance and approval policies, adopt additional regulations or revise existing regulations, or take other actions which may prevent or delay approval or clearance of our products under development. Any of these actions could have a material adverse effect on our business operations and financial condition.

(First emphasis in original.)

58.     The above statements were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading, because they failed to disclose the adverse facts that the IDE study evaluating the use of the CellFX System to treat sebaceous hyperplasia lesions failed to meet its primary endpoints and that, as a result, there was a substantial risk to approval for the CellFX System to treat sebaceous hyperplasia lesions. Additionally, these materially false and misleading statements were made with scienter. Defendants were deliberately reckless as to the falsity of these statements because Pulse's executives had received, reviewed and analyzed the IDE study results, which were the basis for the 510(k) submission, that demonstrated that the IDE study had failed to meet its primary endpoints.

## VI. LOSS CAUSATION

59. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class. Defendants' misrepresentations and omissions caused and maintained the artificial inflation in Pulse's stock price throughout the Class Period until Defendants began to disclose the truth regarding the CellFX System's IDE study to the market.

60. The truth regarding the CellFX System IDE study was partially revealed, and/or the concealed risks materialized, on or about February 8, 2022.

61. On February 8, 2022, before the market opened, Pulse announced that the FDA concluded there was insufficient clinical evidence to support the Company's 510(k) submission to expand the label for the CellFX System to treat sebaceous hyperplasia. Among other things, the FDA found "that the Company had not met the primary endpoints of the sebaceous hyperplasia FDA-approved IDE study."

62. On this news, the Company's share price fell $3.74, or over 34%, to close at $7.12 per share on February 8, 2022, on unusually heavy trading volume.

63. During the Class Period, Plaintiffs and the Class purchased Pulse's securities at artificially inflated prices and were damaged thereby. The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## VII. POST-CLASS PERIOD EVENTS

64. On May 11, 2022, Pulse held a conference call with analysts and investors regarding its Q1 2022 financial results. During the call, Defendant Uecker stated:

> Recently, we had our initial meeting with FDA to clarify issues raised in the AI letter. Shortly following the meeting, and at FDA's request, we provided additional analysis of our SH comparative clinical data. A follow-on discussion is being scheduled with the FDA to review the additional data sets. We expect to continue our collaboration with FDA during this 510(k) review process and to formally respond to the AI letter.

## VIII.   ADDITIONAL SCIENTER ALLEGATIONS

65.     As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Pulse, their control over, and/or receipt and/or modification of Pulse's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Pulse, participated in the fraudulent scheme alleged herein.

66.     After Pulse had already failed to obtain FDA approval for CellFX System to treat SH in February 2020, Defendants repeatedly emphasized that obtaining approval for SH was a "top priority" for Pulse. For example, on October 20, 2020 press release, Defendant Uecker stated "We have long viewed SH as a ***top addressable market priority for the CellFX System*** based on patient demand in clinics today and the CellFX System's early demonstration of procedure effectiveness."

67.     The Individual Defendants knew what the FDA required to approve an expanded indication for SH. On November 9, 2020, during the Q3 2020 earnings call, Defendant Uecker affirmed that Pulse had "completed an additional pre-submission meeting with [the] FDA to agree on the requirements for a subsequent 510(k) submission for the treatment of patients with sebaceous hyperplasia." Based on this guidance, Defendants "submitted and received approval for an IDE . . . , allowing [them] to commence a comparative pivotal study."

68.     Pulse is a small company focused on the development of the CellFX System. As of December 31, 2021, it had 142 employees, and "substantially all" of them were located at the Company's headquarters. Of these, 81 were engaged in research and development activities. Given that the FDA approval for CellFX System to treat SH would significantly expand its total addressable market, it would be absurd to suggest that the Individual Defendants did not know that

the IDE study failed to meet its primary endpoints. In addition, a former[4] QA manager recalled attending bi-weekly all-hands meetings, which included Defendant Uecker, where they discussed clinical trials. The same QA manager also recalled that, prior to FDA submissions, Defendant Uecker would meet regularly with Bill Knape, who led the clinical group, and they would share updates with the rest of the organization.

69.     Given that SH was a "top priority" and Defendants admittedly knew of the requirements for the 510(k) application, it is reasonable to infer that the Individual Defendants knew the IDE study failed to meet its primary endpoints. Indeed, Defendants repeatedly stated that they were "finalizing" the submission, making clear that they were aware of the status and contents of the 510(k) application.

70.     Moreover, as to other clinical applications, Defendants have been forthcoming about the clinical data and its significance. For example, during the Q1 2021 call on May 10, 2021, Defendant Uecker stated that "[O]ur intention *is always to be very open and transparent with our clinical data*." He continued, "I think we've always tried to get our clinical data out in scientific meetings as we're able as that data gets finalized and as those meetings come around and our investigators *desire to publish some of that information*. So I think you can expect for us to get that data [on basal cell carcinoma] out just as soon as we're able to do that." The implication from Defendants' failure to disclose the SH clinical data, therefore, is that they did not "desire to publish . . . that information" because they knew the study failed to meet its primary endpoints.

## IX.     CORPORATE SCIENTER ALLEGATIONS

71.     Each of the Individual Defendants was a high-ranking management-level employee. The scienter of each of the Individual Defendants and of all other management-level employees of Pulse, including each high ranking officer or director, is imputable to Pulse. The knowledge of each

---

[4] This confidential witness worked for Pulse from October 2018 to the end of the Class Period. He was responsible for implementation, management, and production. During his tenure, he reported to An Nguyen, Pulse's director of R&D and mechanical engineering who was responsible for regulatory submissions to the FDA.

of these individuals should therefore be imputed to the Company for the purposes of assessing corporate scienter.

72. Even aside from the scienter of the Individual Defendants, the facts alleged herein raise a strong inference of corporate scienter as to Pulse as an entity. Corporate scienter may be alleged independent of individual defendants where a statement would have been approved by corporate officials sufficiently knowledgeable about the company to know the statement was false. Here, the statements alleged were made to the investing public regarding the Company's seeking an expanded indication for CellFX System, Pulse's only product, which would dramatically increase its commercial opportunity in the U.S.—all important topics that would necessarily require approval by appropriate corporate officers who, as alleged, had very different information in their hands at the time from what was disclosed to the investor.

## X. CLASS ACTION ALLEGATIONS

73. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Pulse securities between May 10, 2021 and February 7, 2022, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

74. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Pulse's shares actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds or thousands of members in the proposed Class. Millions of Pulse shares were traded publicly during the Class Period on the NASDAQ. Record owners and other members of the Class may be identified from records maintained by Pulse or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

75. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

76. Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

77. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Pulse; and

(c) to what extent the members of the Class have sustained damages and the proper measure of damages.

78. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XI. UNDISCLOSED ADVERSE FACTS

79. The market for Pulse's securities was open, well-developed and efficient at all relevant times. As a result of these materially false and/or misleading statements, and/or failures to disclose, Pulse's securities traded at artificially inflated prices during the Class Period. Plaintiffs and other members of the Class purchased or otherwise acquired Pulse's securities relying upon the integrity of the market price of the Company's securities and market information relating to Pulse, and have been damaged thereby.

80.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Pulse's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Pulse's business, operations, and prospects as alleged herein.

81.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Pulse's financial well-being and prospects. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## XII.     APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

82.     The market for Pulse's securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Pulse's securities traded at artificially inflated prices during the Class Period. On August 30, 2021, the Company's share price closed at a Class Period high of $26.63 per share. Plaintiffs and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Pulse's securities and market information relating to Pulse, and have been damaged thereby.

83.     During the Class Period, the artificial inflation of Pulse's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages

sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Pulse's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Pulse and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

84.     At all relevant times, the market for Pulse's securities was an efficient market for the following reasons, among others:

(a)     Pulse shares met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)     As a regulated issuer, Pulse filed periodic public reports with the SEC and/or the NASDAQ;

(c)     Pulse regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)     Pulse was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

85.     As a result of the foregoing, the market for Pulse's securities promptly digested current information regarding Pulse from all publicly available sources and reflected such information in Pulse's share price. Under these circumstances, all purchasers of Pulse's securities during the Class Period suffered similar injury through their purchase of Pulse's securities at artificially inflated prices and a presumption of reliance applies.

86. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## XIII. NO SAFE HARBOR

87. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Pulse who knew that the statement was false when made.

## XIV.  CLAIMS

### FIRST CLAIM

### Violation of Section 10(b) of The Exchange Act and

### Rule 10b-5 Promulgated Thereunder

### Against All Defendants

88.     Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

89.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase Pulse's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

90.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Pulse's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

91.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Pulse's financial well-being and prospects, as specified herein.

92.     Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Pulse's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue

statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Pulse and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

93. Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

94. Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Pulse's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

95.     As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Pulse's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired Pulse's securities during the Class Period at artificially high prices and were damaged thereby.

96.     At the time of said misrepresentations and/or omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that Pulse was experiencing, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Pulse securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

97.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

98.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**SECOND CLAIM**

**Violation of Section 20(a) of The Exchange Act**

**Against the Individual Defendants**

99.     Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

100.     Individual Defendants acted as controlling persons of Pulse within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their

ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

101. In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

102. As set forth above, Pulse and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## XV. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(a) Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b) Awarding compensatory damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## XVI.    JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

DATED:  July 12, 2022                    **GLANCY PRONGAY & MURRAY LLP**

By:    _/s/ Pavithra Rajesh_
Robert V. Prongay
Casey E. Sadler
Pavithra Rajesh
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email:  info@glancylaw.com

*Counsel for Lead Plaintiff and*
*Lead Counsel for the Class*

## PROOF OF SERVICE BY ELECTRONIC POSTING

I, the undersigned, say:

I am not a party to the above case and am over eighteen years old. On July 12, 2022, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Northern District of California, for receipt electronically by the parties listed on the Court's Service List.

I affirm under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on July 12, 2022, at Los Angeles, California.

*/s/ Pavithra Rajesh*
Pavithra Rajesh